J-A13023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DYLAN E. MIDDLETON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SARAH N. MIDDLETON | : | |
| | : | |
| Appellant | : | No. 1357 WDA 2024 |

Appeal from the Order Dated October 15, 2024
In the Court of Common Pleas of Mercer County Civil Division at No(s):
No. 2020-1983

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED:  July 3, 2025**

Sarah N. Middleton ("Mother") appeals the October 15, 2024 order modifying the existing custody order and granting Dylan E. Middleton ("Father") primary physical custody of the parties' biological son, G.M., born in October of 2019.  After careful review, we affirm.

The certified record reveals the relevant factual and procedural history of this matter.  The parties are veterans.  Father served in the United States Marine Corps from September of 2001, until his honorable discharge in September of 2005.  As a result of his service, Father suffered from post-traumatic stress disorder ("PTSD") and multiple dislocations of his left shoulder.  Father developed an addiction to opiates from his prescribed pain medication for his shoulder injuries.  *See* N.T. Custody Trial, 6/26/24, at 111-112.  Father entered and successfully completed rehabilitation through

the Veterans' Administration ("VA") in February of 2014, and has since maintained his sobriety. *See id.* at 112-114, 185, and 220; *see also* Father's Exhibit 1.

Mother served in the United States Air Force from 2005 to 2007.[1] Mother suffered from PTSD as a result of her service as well. *See* N.T. Custody Trial, 7/8/24, at 150-151. Mother voluntarily admitted herself to a VA hospital for mental health treatment for several days in September of 2017. *See id.* at 90-91.

Father has been a state correctional officer since 2016 and is currently employed at State Correctional Institution ("SCI")-Mercer, working the overnight shift. Mother was also a state correctional officer. Mother's last position was also at SCI-Mercer, which she left sometime after the parties' separation. Mother is currently self-employed as a dog groomer, and she works out of her home during the mornings.

The parties have a total of four children, three of whom are not subject to this appeal. Father has a ten-year-old daughter, M.M., and a nine-year-old son, Ka.M., from prior relationships. Mother has a fifteen-year-old daughter, Ki.M., also from a previous relationship. The parties married in 2017 and G.M.

---

[1] The record does not reveal the circumstances surrounding Mother's separation from her service.

was born two years later. The parties resided together with their blended family in Mercer County until their separation in approximately June of 2020.

On June 23, 2020, the court granted the parties' petitions for cross-adoptions of M.M. and Ki.M.[2] Five days later, the parties separated after Mother absconded to Washington County with the children. On July 7, 2020, Father filed a divorce complaint, which included a count for custody of G.M. The court entered an agreed-upon final custody order on October 22, 2020 ("existing custody order"), which granted the parties shared legal and physical custody of G.M. on a rotating weekly basis. The exchanges were ordered to occur at a location equidistant between the parties' homes, as they lived two hours apart from each other. On December 3, 2020, the court entered an agreed-upon order that vacated the cross-adoptions of M.M. and Ki.M. The parties' divorce was finalized on June 27, 2022, after which contentious custody litigation continued.

The parties filed multiple emergency petitions for special relief and contempt in 2023. Father filed two emergency petitions around early March of 2023, which alleged that Mother refused to release G.M. for Father's custodial time. The court entered an order on March 10, 2023, directing

---

[2] Mother adopted M.M., whose biological mother is deceased. Father adopted Ki.M., whose biological father had his parental rights involuntarily terminated several years earlier. Mother could not adopt Ka.M. because Father shares custody of him with his biological mother.

Mother to release G.M. to Father the following Tuesday, which was March 14, 2023.  Mother did not comply.  Mother filed an emergency petition on March 17, 2023, alleging that Father continued to abuse drugs, that he posed a threat of physical harm to G.M., and that he refused to consent to G.M.'s participation in trauma therapy.

On March 31, 2023, following a hearing, the court found Mother in contempt for intentionally withholding G.M. from Father, which began on February 14, 2023, and her ongoing refusal to relinquish G.M. to Father after it ordered her to do so.  The court ordered Mother to serve five days in the Mercer County Jail as a sanction for her contempt.  The court also granted Father sole physical custody of G.M. until further order of the court.[3]

On August 4, 2023, Mother filed another emergency petition, which renewed the arguments from her March filing and requested, *inter alia*, temporary sole legal and physical custody of G.M.  Father filed a *pro se* petition for emergency relief and modification of the existing custody order on August 14, 2023.  In his petition, Father alleged that Mother was coaching G.M. to report that he is physically abused, that Mother needed mental health treatment, and requested permanent sole physical custody of G.M.

On September 8, 2023, the court heard the parties' competing petitions for special relief.  The court entered an interim order that reinstated the

---

[3] The court granted Mother two three-day periods of temporary physical custody during this time, one in April of 2023, and one in May of 2023.

parties' rotating weekly physical custody of G.M. pursuant to the existing custody order. Father's modification request was outstanding. The court further appointed Annette Dohanics, Esquire, as guardian *ad litem* ("GAL") for four-year-old G.M. On December 15, 2023, the GAL submitted a report to the court, wherein she recommended shared legal and physical custody of G.M. Thereafter, the court ordered that the parties participate in a custody evaluation, which they completed with Eric Bernstein, Psy.D. The GAL then submitted an updated report on June 24, 2024, wherein she recommended that primary physical custody be awarded to Mother.

On June 26 and July 8, 2024, the Honorable D. Neil McEwen held hearings on Father's *pro se* petition, during which the court interviewed G.M. *in camera* in the presence of the parties' counsel.[4] Father testified on his own behalf and presented the following witnesses: M.M. and Ka.M., who testified *in camera*; Layla Bocook, Father's live-in babysitter; Ronald Middleton ("Mr. Middleton"), G.M.'s paternal grandfather; Anthony Corvino, Father's friend and former co-worker; Nancy Middleton ("Mrs. Middleton"), G.M.'s paternal grandmother; and Pamela McGirr, the parties' former babysitter. Mother testified on her own behalf and presented the following witnesses: Ki.M., who testified *in camera*; Dr. Bernstein; Paula Millsaps, Mother's spiritual counselor; and Laurie Franco, G.M.'s home educator.

---

[4] The Honorable D. Neil McEwen has presided over the parties' case since at least June of 2022.

Dr. Bernstein's report recommended that Mother be granted primary physical custody. ***See*** Mother's Exhibit A at 22. However, at the hearing, Dr. Bernstein testified that Mother's representations to him about Father during the evaluation were not consistent with additional evidence of record. ***See*** N.T. Custody Trial, 7/8/24, at 33. Dr. Bernstein indicated that Mother was not forthcoming when participating in his evaluation. ***Id.*** at 24-27 and 32-33. For example, Dr. Bernstein testified that he was unaware of the extent that Mother withheld G.M. from Father in direct violation of court orders. ***Id.*** at 25. Significantly, the GAL based her updated recommendation of granting Mother primary physical custody on Dr. Bernstein's report. ***See*** Report and Recommendation of Guardian *Ad Litem*, 6/24/24.

By order and opinion dated and entered October 15, 2024, the court awarded Father primary physical custody of G.M. ***See*** Adjudication and Order, 10/15/24, at 37. Mother was awarded partial physical custody during the school year, as defined by Father's school district's calendar, "every other weekend from Friday at 5:00 p.m. until Sunday at 8:00 p.m." ***Id.*** During the summer months of June, July, and August, the court awarded Mother 10 consecutive custodial days of her choosing per month, subject to a required 30-day notice to Father. Finally, the court maintained the parties shared legal custody of G.M.

On November 4, 2024, Mother, through counsel, filed a timely notice of appeal and contemporaneous concise statement of errors complained of on

appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on December 6, 2024.

On appeal, Mother raises the following issues for our review:

1. Did th[e] honorable trial court [err] and abuse its discretion by failing to accurately apply 23 Pa.C.S.[A. §] 5328, the 16 relevant custody factors, to the facts of this case. The trial court granted Father with primary physical custody despite expansive evidence of Father's corporal punishment, physical[,] and emotional abuse, Father's history of substance abuse, his reluctance to any counseling for the child, despite Father working nights with limited physical ability to parent primarily, and granted Father primary physical custody despite both the [GAL] and the professional, expert report and opinion [of] Dr. []Bernstein, a psychologist, both recommending that Mother should have primary physical custody[?]

2. Did th[e] honorable trial court [err] and abuse its discretion in finding Mother to have questionable credibility, to be self-serving, and to be vexatious without substantial evidence to justify such serious and damaging opinions[?]

3. Did the honorable trial court [err] and abuse its discretion by failing to consider or mention several of Mother's material witnesses' testimony[?]

Mother's Brief at 8-9.[5]

Our standard of review is well-settled:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may

_____

[5] We note with displeasure that the GAL did not participate in this appeal.

not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

Importantly, "[i]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion." *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (quotation omitted). This Court has recognized that "the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." *Ketterer,* 902 A.2d at 540 (quotation omitted).

- 8 -

With respect to custody cases, the primary concern is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted).

Child custody actions are governed by the Child Custody Act, 23 Pa.C.S.A. §§ 5321-5340. Section 5328(a) sets forth the following factors that the court must consider when awarding custody:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7)   The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)  The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9)   Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)  Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)  The proximity of the residences of the parties.

(12)  Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13)   The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14)  The history of drug or alcohol abuse of a party or member of a party's household.

(15)  The mental and physical condition of a party or member of a party's household.

(16)  Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[6]

Further, with regard to the custody factors, this Court has stated:

_____

[6]  Effective August 13, 2024, Section 5328(a) was reordered and amended. **See** 23 Pa.C.S.A. § 5328 (amended April 15, 2024, P.L. 24, No. 8, § 3, effective in 120 days).  However, as the pre-amended factors, as listed above, were not in effect at the time the trial court held the evidentiary hearings, the amended factors do not apply in this matter.  **See C.R.F. v. S.E.F.**, 45 A.3d 441, 445 (Pa. Super. 2012) (concluding that provisions of the Act apply "if the evidentiary proceeding commences on or after the effective date of the Act[.]").

**All** of the factors listed in [S]ection 5328(a) are required to be considered by the trial court when entering a custody order. . . . The record must be clear on appeal that the trial court considered all the factors.

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, [S]ection 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen Section 5328[(a)] custody factors prior to the deadline by which a litigant must file a notice of appeal.

In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d).

*A.V. v. S.T.*, 87 A.3d at 822-823 (some citations omitted, formatting altered, and emphasis in original).

This Court has explained that the amount of weight a trial court gives any one factor is largely discretionary. *See M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013). "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id.* at 339 (internal citations omitted).

With respect to the statutory factors, the trial court weighed Sections 5328(a)(1), (4) – (6), (9), (13), and (16) in Father's favor. *See* Adjudication and Order, 10/15/24, at 26, 28-31, and 33-34. The trial court weighed Section 5328(a)(14) in Mother's favor. *Id.* at 33-34. The court found Sections

- 11 -

5328(a)(2) − (3), (7), (10) − (12), and (15) to be neutral.[7] *Id.* at 26-29 and 31-34. Pursuant to Section 5328(a)(16), the court considered the recommendations of Dr. Bernstein and the GAL and ultimately determined that the recommendations were based upon narratives provided by Mother which the court found were not credible. *Id.* at 34.

Of particular note, the trial court found that the factors at Sections 5328(a)(1), (5), (13), and (16) were determinative in this case. The court found that Mother "has a history of conduct designed to limit continued contact of [G.M.] and [] [F]ather." *Id.* at 26. The court further found that G.M.'s paternal grandparents, who live in "close proximity" to Father, have "extensive involvement" in his life. *Id.* at 28. With regard to conflict and cooperation between the parties, the court recognized that "the conflict between these two [p]arties is high," but found there was credible evidence of Mother's "inability to cooperate." *Id.* at 33.

Turning to the merits of Mother's appeal, her first issue challenges the trial court's findings as to Sections 5328(a)(2), (10), (12), (14), and (16). Mother argues that the trial court abused its discretion in its application of the

---

[7] We note that while the trial court did not explicitly delineate its reasoning as to Section 5328(a)(2.1) in its contemporaneous opinion, the court did indeed consider the history of child welfare agency involvement and the allegations of child abuse within its discussion of Sections 5328(a)(1) − (2) and (8). *See* Adjudication and Order, 10/15/24, at 26-27, 30. As the substance of the factor was clearly considered by the trial court, we observe no error. *See* *A.V.*, 87 A.3d at 823.

- 12 -

custody factors to this case. Specifically, Mother contends that if the trial court had "properly" applied the record evidence to these factors, it "would and should have resulted in Mother being awarded primary physical custody" of G.M. Mother's Brief at 26-27. We disagree.

Mother's arguments essentially ask this Court to re-weigh the evidence and substitute our judgment for that of the trial court. We cannot to do so, as we must defer to the trial court's determinations with respect to the weight of the evidence when they are supported by the record evidence. *See A.V.*, 87 A.3d at 820. As discussed *infra*, we conclude that the trial court's findings are supported by the evidence of record. We also note that Mother fails to provide any citations to the record in her brief to support her factual arguments. *See* Pa.R.A.P. 2119.

With respect to Section 5328(a)(2), the present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child, Mother argues that the record contained evidence of "Father's corporal punishment, face grabbing, [and] bruising" of G.M. and his half-siblings. Mother's Brief at 25. Based upon this evidence, Mother claims this factor should have favored her.

The trial court found this factor neutral inasmuch as it found no risk of harm to G.M. while in the custody of either party. *See* Adjudication and Order, 10/15/24, at 26-27. In its 1925(a) opinion, the trial court explained, as follows:

> Parents are permitted to discipline their children by corporal punishment, and this [c]ourt will not hold appropriate discipline against a parent.
>
> . . .
>
> [Mother] did not persuade this [c]ourt that any corporal punishment that may have occurred was in excess of [the] standard [allowed by law]. Furthermore, given the lack of credibility found in [Mother] due to numerous unfounded allegations and a perceived abuse of the CYS system, this court found allegations of physical . . . abuse to be unpersuasive.

Trial Court Opinion, 12/6/24, at 8-9.

Indeed, our Commonwealth recognizes that a parent's "use of force" upon their child is "justifiable" if the following conditions are met:

> (i) the force is used for the purpose of safeguarding or promoting the welfare of the minor, including preventing or punishment of his misconduct; and
>
> (ii) the force used is not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation.

18 Pa.C.S.A. § 509. This Court has stated that "[p]arents or guardians may use corporal punishment to discipline their children so long as the force" is in accordance with 18 Pa.C.S.A. § 509. **Boland v. Leska**, 454 A.2d 75, 78 (Pa. Super. 1982).

The trial court's findings are supported by the record evidence, which confirms that Father's use of corporal punishment was acceptable under Pennsylvania law. Father's older children, M.M. and Ka.M., each testified that Father disciplines them by hitting them on the buttocks with a hand, which they referred to as "butt whoppin[g]." N.T. Custody Trial, 6/26/24, at 8,

13-14, 16, 27, and 29. They explained that Father used this form of discipline when they were "really bad" and in "a lot of trouble," which rarely happened. *Id.* at 13-14, 16-17, and 27-28. Father confirmed this testimony. Ki.M., Mother's daughter, similarly testified that Father "grabbed us by the face" as a form of discipline when "[h]e wants us to listen." N.T. Custody Trial, 7/8/24, at 61-62. The foregoing evidence supports the trial court's conclusion that Father employed corporal punishment in an appropriate manner. *See Boland*, 454 A.2d at 78 ("[The] instances considered closely follows errant behavior by the child and neither involved extreme force or was part of a repeated course of unwarranted punishment.").

In relation to Mother's claim that Father had left bruises on G.M. and his half-siblings, there is no such evidence in the record. Father testified that he pled guilty to summary harassment in 2018, based upon advice from legal counsel, in relation to "marks on [Ka.M.'s] butt[ocks] that nobody could figure out where they came from." N.T. Custody Trial, 6/26/24, at 177-179. As best we can discern, there was an extended temporary Protection from Abuse ("PFA") order against Father, presumably in relation to this incident, which did not include an admission of guilt or finding of fault for the cause of the marks.[8] *See id.* at 187-190. Father also testified that he never lost custodial time of Ka.M. as a result of these events. *Id.* at 187. Father averred that although

---

[8] The record does not establish upon whose behalf this temporary PFA order was granted.

he was investigated by local child welfare agencies numerous times in relation to G.M., none of the allegations have ever been sustained. *Id.* at 130. Moreover, Father testified that there were instances where G.M. returned to his custody from Mother's home with bruises, scratches, and cuts. *See* N.T. Custody Trial, 7/8/24, at 179.

Dr. Bernstein confirmed that the investigations concerning Father have all been unfounded. *Id.* at 24-25 and 45. Furthermore, Dr. Bernstein testified that G.M. is not "at immediate risk" of harm or abuse in either parties' custody. *Id.* at 47-48. Based upon evidentiary review, Mother is not entitled to relief pursuant to her arguments under Section 5328(a)(2).

Turning to Section 5328(a)(10), which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child, Mother asserts that the court erred or abused its discretion in finding this factor to be neutral because Father refused to give his consent for G.M. to participate in trauma therapy.

The trial court found this factor neutral between the parties because, although it found that Mother was "more likely to attend to the daily physical and emotional needs," it concluded that Father was "providing an environment more likely to foster the developmental and educational needs" of G.M. Adjudication and Order, 10/15/24, at 31-32. The court specifically faulted Father for his "reluctance to counseling" for G.M. and found that Mother would better attend to G.M.'s emotional needs. *Id.* The court determined that

Father would better attend to G.M.'s developmental and educational needs when comparing his proposed plans for the schooling of G.M. to Mother's plans. *Id.*

The record supports the trial court's findings. There is no dispute that Father did not consent to G.M.'s participation in trauma therapy. Father explained, however, that his reluctance was because he did not observe the behaviors Mother was concerned about during his custodial time. *See* N.T. Custody Trial, 6/26/24, at 140-144. Father explained that the behavioral concerns of Mother included G.M. hitting and/or spitting on the family dogs and his half-siblings. *Id.* at 140. As stated above, because of this reluctance, the court found the emotional needs portion of this factor in favor of Mother. *See* Adjudication and Order, 10/15/24, at 31-32.

However, this factor requires further consideration, which includes developmental and educational needs. Father testified that G.M. is eligible to enter kindergarten for the upcoming school year in his school district. *See* N.T. Custody Trial, 6/26/24, at 117. Father stated that he had spoken with the school district about G.M.'s prospective enrollment. *Id.* Father explained that he believed that G.M. would benefit from the "socialization from public school." *Id.* at 172. Mother testified that she had plans to enroll G.M. in preschool, but did not articulate any plans for additional schooling. *See* N.T. Custody Trial, 7/8/24, at 137. Mother stated that Ki.M. attends an online school. *Id.* at 131.

Mother only takes issue with this factor due to Father's lack of consent for therapy, but the trial court indeed weighed this evidence against Father and in her favor. *See* Adjudication and Order, 10/15/24, at 31-32. As required, the court balanced the multiple interests within this factor and was within its discretion to ultimately decide that it favored neither party. *See* *A.V.*, 87 A.3d at 820. No relief is due pursuant to Section 5328(a)(10).

Next, we turn to Section 5328(a)(12), which assesses each party's availability to care for the child or ability to make appropriate child-care arrangements. Mother argues that the trial court erred or abused its discretion inasmuch as Father's overnight work schedule "spell[s] disaster for competent parenting." Mother's Brief at 25.

The trial court found this factor to be neutral as it determined that the parties "are both available to provide any necessary care." Adjudication and Order, 10/15/24, at 32. The court acknowledged that Mother works from her home and that Father's current work schedule allows him to care for G.M. during the daytime. *Id.*

The certified record contains sufficient support for the trial court's findings. Father testified that he works the overnight shift at SCI-Mercer, which is from 10:00 p.m. to 6:00 a.m. *See* N.T. Custody Trial, 6/26/24, at 109-110. Father works Tuesday through Saturday, with Sunday and Monday being his days off. *Id.* Father asserted that he typically sleeps a few hours at the end of his shift at the prison, which is allowed if he has completed his

responsibilities and there are no emergencies. *Id.* at 150 and 174-176. Father explained that he typically puts the children to bed around 8:30 to 9:00 p.m. before he leaves for his shift. *Id.* at 117-118 and 153-54. He returns home before the children wake up for the day. Father testified that he gets his older children ready and off to school in the mornings. Father testified that he would facilitate G.M.'s morning routine as he does with his older children, who attend the same school district. *Id.* at 5, 19, and 117-118.

Layla Bocook testified that she resides in Father's home and provides overnight childcare while Father is at work, which Mr. and Mrs. Middleton confirmed. *Id.* at 31-33, 39, 59-60, and 84. Father testified that his parents assist him with anything he requires in terms of his children. *Id.* at 168. This includes watching the children if Father needs sleep, transporting them if they need to go to two separate places, and facilitating the custody exchanges of G.M. Mr. and Mrs. Middleton corroborated this during their respective testimonies and stated that they would continue in their supportive role. *Id.* at 44-45, 51-52, 76, and 81-82.

Specifically, Mother's argument is concerned with the quality of Father's care of G.M. based on his work schedule. This must fail because it is not relevant to what is contemplated in this factor, *i.e.*, Father's availability to care for or make childcare arrangements for G.M. Accordingly, we discern no error or abuse of discretion and conclude no relief is due as to Section 5328(a)(12).

Turning to Section 5328(a)(14), the history of drug or alcohol abuse of a party or member of a party's household, Mother argues that the court erred or abused its discretion due to Father's history of substance abuse. Mother baldly contends that Father's substance abuse is "continuing in some form." Mother's Brief at 25.

The trial court found this factor in favor of Mother due to Father's history of substance abuse. *See* Adjudication and Order, 10/15/24, at 33-34. Notwithstanding, the court continued:

> [W]hile [] Mother has raised concerns regarding [] Father's use of controlled substances, the [c]ourt finds that any use and/or abuse was historical. Father has acknowledged a history of abuse and maintains, and the [c]ourt believes, that he has overcome his controlled substance abuse and it is not an ongoing concern. The [c]ourt does not find the allegations of ongoing abuse by [Father] to be credible.

*Id.*

Our review of the certified record confirms sufficient support for the trial court's findings. Father admitted that he developed an addiction to opiates after being prescribed them due to his aforementioned shoulder injuries. *See* N.T. Custody Trial, 6/26/24, at 111. Father testified that his addiction, at its worst, included heroin use. *Id.* Father stated that he successfully completed in an inpatient substance abuse treatment program through the VA in Butler, Pennsylvania. *Id.* at 112. Father also provided the court with documentation confirming his completion of the program, which the documentation shows he entered on November 18, 2013 and completed on February 21, 2014. *Id.* at

112-113; *see also* Father's Exhibit 1. Father participated in the "Vivitrol program" for three years after he completed substance abuse treatment.[9] *Id.* at 112 and 185. Father testified that he has not abused substances since before he completed treatment and has been clean for over ten years. *Id.* at 113-114 and 220. Mr. Middleton confirmed Father's testimony in this regard. *Id.* at 61.

We note that Father testified that he currently has a medical marijuana card from the Commonwealth. *See* N.T. Custody Trial, 7/8/24, at 182. Father stated that he uses marijuana as prescribed by his doctor and obtains it legally through a dispensary. *Id.* at 182-183.

Mother testified that Father abused substances during their relationship. *Id.* at 104-107. Nevertheless, the court was well within its discretion to find Mother's uncorroborated claims of Father's allegedly ongoing substance abuse not credible, especially in light of Father's credible, documented, and substantiated testimony that proved otherwise. *See A.V.*, 87 A.3d at 820. Again, the trial court did indeed weigh the evidence as to which Mother complains against Father and in her favor. *See* Adjudication and Order, 10/15/24, at 33-34. Therefore, Mother is not due relief pursuant to Section 5328(a)(14).

_____

[9] The record does not provide further definition or explanation of the "Vivitrol" program, apart from that it includes injections. N.T. Custody Trial, 6/26/24, at 185.

The final factor that Mother takes issue with is Section 5328(a)(16), which concerns any other consideration that the trial court deems relevant to its decision. Mother argues that the court erred or abused its discretion when it "inexplicably ignored and refused to follow" the opinions of the custody evaluator, Dr. Bernstein, and the GAL, who both recommended that primary physical custody be granted to Mother. Mother's Brief at 25.

With respect to this factor, the trial court "note[d] its respect for both the GAL and Dr. Bernstein and . . . the conclusions and opinions of both." Adjudication and Order, 10/15/24, at 34. The court determined that the recommendations were "significantly" based upon information received from Mother, which it determined was not credible. *Id.* In its Rule 1925(a) opinion, the court explained that it found Dr. Bernstein's recommendation "unpersuasive" because it was based on information that was provided by Mother, prior to the hearing, that the court later found not credible. Trial Court Opinion, 12/6/24, at 11. Further, the court clarified that because the GAL's recommendation was based on Dr. Bernstein's report, it "placed little weight on its persuasive value." *Id.*

Mother failed to provide any legal authority for her bald contentions as to this factor. Nonetheless, our review has revealed relevant Pennsylvania case authority. Although "a trial court is not required to accept the conclusions of an expert witness . . . it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be

supported by competent evidence of record." ***Interest of S.A.S.***, 305 A.3d 1039, 1049 (Pa. Super. 2023) (citation omitted). In the context of child custody cases, this Court has stated:

> [W]hen expert evaluation is uncontradicted or unqualified, a child custody court abuses its fact finding discretion if it totally discounts expert evaluation. To say that a court cannot discount uncontradicted evidence, however, is merely to rephrase the requirement that a child custody court's conclusion have competent evidence to support it. So long as the trial court's conclusions are founded in the record, the lower court [is] not obligated to accept the conclusions of experts.

***King***, 889 A.2d at 632.

Here, the trial court's findings are supported by the record. As previously mentioned, Dr. Bernstein's report recommended that the court award primary physical custody to Mother. ***See*** Mother's Exhibit A at 22. On cross-examination, however, Dr. Bernstein confirmed that Mother was not fully truthful when participating in his evaluation. ***See*** N.T. Custody Trial, 7/8/24, at 24-27 and 32-34. Significantly, Dr. Bernstein testified that he was unaware of Mother's testimony at the adoption proceedings of Ki.M. ***Id.*** at 32-33. At the proceedings on June 23, 2020, Mother testified under oath that she had no concerns about Father adopting Ki.M., no concerns about Ki.M.'s safety in his custody, and no concerns about Father's harassment charge involving Ka.M. ***See*** Father's Exhibit 21, at 17-19. Dr. Bernstein testified that this is not consistent with the history that Mother provided him during the evaluation. ***See*** N.T. Custody Trial, 7/8/24, at 33.

Further, Dr. Bernstein was not aware of the extent that Mother withheld G.M. from Father. *Id.* at 25. Dr. Bernstein testified that he was unaware that the withholding lasted 52 days and "inferred" that Mother was held in contempt for a direct violation of the court's order to release G.M. to Father. *Id.* Dr. Bernstein confirmed that Mother did not share with him that she repeatedly claimed in court that she "had experts" to prove that G.M. was being abused but never presented any evidence to support that position. *Id.* at 26. Dr. Bernstein stated that he was unaware that Mother had G.M. participate in counseling over the objection of Father. *See id.* at 26-27.

The GAL's first report recommended that the parties share legal and physical custody of G.M. *See* Report and Recommendation of Guardian *Ad Litem*, 12/15/23, at 16. In the GAL's updated report, however, the GAL noted that, "[s]ince December 2023, the parties have not raised any new, substantial concerns about the other's parenting." Report and Recommendation of Guardian *Ad Litem*, 6/24/24, at 9. Nonetheless, in accordance with Dr. Bernstein, the GAL changed her recommendation to primary physical custody with Mother. *See id.*

We discern no error of law or abuse of discretion in the trial court's findings. Despite Mother's assertion, the court did not ignore the recommendations of Dr. Bernstein and the GAL. The court undoubtedly considered the recommendations and did not discount them, as discussed above. *See* Adjudication and Order, 10/15/24, at 34; *see also S.A.S.*, 305

A.3d at 1049; *King*, 889 A.2d at 632. The court was within its discretion, as the ultimate fact finder, to assign them appropriate weight, not accept them, and make an independent decision based upon the competent evidence of record. *See S.A.S.*, 305 A.3d at 1049; *King*, 889 A.2d at 632; *see also A.V.*, 87 A.3d at 820 ("The parties cannot dictate the amount of weight the trial court places on evidence."). No relief is due pursuant to Section 5328(a)(16).

Based on the foregoing, we discern no abuse of discretion or error of law regarding the trial court's findings with respect to Sections 5328(a)(2), (10), (12), (14), and (16) of the Act. Thus, Mother's first issue merits no relief.

Mother's next issue is her challenge to the trial court's finding related to her credibility. Specifically, Mother argues that the trial court found her "to have questionable credibility . . . without substantial evidence to justify such serious and damaging opinions." Mother's Brief at 26.

On this topic, the trial court stated:

> The [c]ourt has previously found, and continues to find, []
> [Mother] to be calculating and self-serving at best and vexatious
> at worst. The [c]ourt does not find [] [Mother] credible.

Adjudication and Order, 10/15/24, at 34.

Mother provides no legal authority or citations to the record that support her baseless claim that the trial court erred or abused its discretion in finding her not credible. Mother has advanced no argument as to how the record does not support the court's credibility determination and we will not create

- 25 -

one for her. *See In re R.D.*, 44 A.3d 657, 674 (Pa. Super. 2012) (internal citations omitted) ("We . . . will not develop arguments on behalf of the appellant."). Indeed, it is the duty of the trial court to make credibility determinations of the parties before it. *See A.V.*, 87 A.3d at 820. Mother's dissatisfaction with the court's assessment of her credibility does not equate to an error of law or an abuse of discretion. Therefore, we must defer to the trial court's credibility determination. *See id.* Mother's second issue fails.

Mother's final issue concerns the trial court's lack of discussion regarding several of the witnesses she presented. However, Mother abandons this issue in the argument section of her brief and makes no mention of any arguments, legal authority, or record evidence related to it. *See* Mother's Brief at 18-27. Accordingly, we deem this issue to be waived for lack of development. *See Commonwealth v. Noss*, 162 A.3d 503, 509 (Pa. Super. 2017) (finding waiver where Appellant failed to develop the issue in his brief) (citing *Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006) ("[A]rguments which are not appropriately developed are waived[.]")).[10]

Based on the foregoing, we conclude that none of Mother's arguments entitle her to relief. The trial court carefully and thoroughly considered the best interests of G.M. based on the court's factual findings, which are

---

[10] Even if not waived, Mother's argument would fail because the trial court's discretion includes determinations with respect to the weight of the record evidence, which the parties cannot dictate. *See A.V.*, 87 A.3d at 820.

supported by the record, and we conclude that its decision to grant Father primary physical custody is reasonable. ***See A.V.***, 87 A.3d at 820. Thus, we discern no error of law or abuse of discretion and appellate inference is unwarranted. Accordingly, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/3/2025